## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

PATRICIA CLARKE and
JAMES CLARKE

CRIMINAL NO.
3:04cr21 (SRU)

__MEMORANDUM OF DECISION__

The government charges that Patricia Clarke, aided by her husband James Clarke, fraudulently obtained disability benefits from the Social Security Administration and the Office of Personnel Management by misrepresenting her physical and mental condition. Patricia Clarke[1] asks this court to (1) suppress videotape surveillance of her activities outside her house, (2) exclude evidence obtained from three of her physicians and her psychologist, and (3) dismiss the charges on the grounds of government misconduct. None of the requested relief is warranted.

I.      **Video Surveillance**

A.      Facts

For approximately eight months, beginning in August 2004, United States Postal Inspectors conducted video surveillance of Clarke engaging in various activities outside of her house, activities that the government believes belie her claim of disability. The video footage was taken from within a neighbor's house using consumer-grade video equipment, i.e., the type of equipment that could be purchased at most consumer electronics stores. The surveillance resulted in approximately thirty hours of footage.

Although Clarke does not dispute any of these facts, she nevertheless argues that a

---

[1] James Clarke has not formally joined any of his wife's motions, but in a phone conference with the court and at oral argument his counsel argued in support of some of them.

hearing is necessary to allow her to develop a record regarding the extent of her neighbors'

consent to the videotaping and the motivations of the officers conducting the videotaping.

Because, as I will explain below, neither issue is relevant to the issue of suppression, a hearing is

not necessary.[2]  *See United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (suppression

hearing only necessary if the moving papers allow a court to conclude that there are contested

issues of fact going to the validity of the search).

     B.    <u>Discussion</u>

Based on Patricia Clarke's motion papers and the arguments made by her counsel and her

husband's counsel, she appears to be arguing that videotaping her engaging in lawful activities in

the "curtilage" of her home, without a warrant, was an unreasonable search, made even more

unreasonable by (a) improper motives of the officers conducting the surveillance as indicated by

their "salacious" comments, and (b) the possibility that the neighbors on whose property the

officers were positioned may not have fully consented to the officers' actions.  In other words,

Clarke appears to assume that the officers' videotaping constituted a search, and focuses her

arguments on whether that search was reasonable under the all the circumstances.

The Fourth Amendment secures the right of the people to be free from "unreasonable

searches and seizures."  It would not be out of the question to give the word "search" the

relatively broad meaning of "to explore or examine," and focus judicial analysis on the question

whether a particular search was "reasonable."  As it turns out, however, the Supreme Court has

given a different reading to the Fourth Amendment.  The question whether a search is

---

[2] I have, however, reviewed portions of the videotaped surveillance identified by the government and Clarke as relevant to Clarke's motions.

"reasonable," happens to have a relatively simple answer – without a warrant, a search is almost always unreasonable.  The exceptions to that rule are few and relatively well delineated.  The more difficult question – and the question that has been the subject of much Supreme Court debate –  is whether a "search" has taken place at all, and that question turns not so much on the conduct of the searcher but on the privacy expectations of the person searched.  Thus, the real issue in this case is the extent of Fourth Amendment protection given to Clarke's videotaped activities and not the reasonableness of the conduct of the officers in videotaping her or their conduct in securing her neighbors' consent to the videotaping.

Though stemming from the Supreme Court's 1967 decision in *Katz v. United States*, 389 U.S. 347 (1967), the test for whether a Fourth Amendment search has occurred was set forth succinctly in the Court's more recent decision in *Kyllo v. United States*, 533 U.S. 27 (2001).

> [A] Fourth Amendment search does *not* occur – even when the explicitly protected location of a *house* is concerned – unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and "society [is] willing to recognize that expectation as reasonable."

*Id.* at 33 (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)).  Moreover, the Court has repeatedly held that society is not prepared to recognize as reasonable an expectation of privacy in the observation of activities exposed to public view, even when those activities are undertaken in the home (or its curtilage).  *See Katz*, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *Ciraolo*, 476 U.S. at 213 ("The Fourth Amendment protection has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.").

Here, although Clarke's activities were not observable from a public thoroughfare, they

all could have been viewed by her neighbors.  Society does not recognize an expectation of privacy in activity viewable by one's neighbors.  *See United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) (no expectation of privacy in activity viewable by other tenants in a multi-family apartment).  Consequently, even assuming all the areas in which Clarke conducted her activity were "curtilage," and also assuming that she truly had a subjective expectation of privacy, the officers' observation of those activities was not a Fourth Amendment search, because all her activities could easily have been viewed by her neighbors.[3]

The fact that the officers did not view her activities with the naked-eye, but rather through video equipment with some telephoto capabilities, does not change the analysis.  All of the activity in question could have been seen with only the naked eye, and the use of telephoto capabilities (capabilities that would be available to any neighbor who wished to purchase similar equipment) to clarify that viewing does not change the nature of the protection afforded to the activities viewed.  *See United States v. Lace*, 669 F.2d 46, 51 (2d Cir. 1982) (use of telescope "is not proscribed in places where the defendant otherwise has exposed himself to public view").

Because the viewing of Clarke's activities was not a "search" within the meaning of the Fourth Amendment, *why* or *how* those activities were viewed is not relevant.  No matter how desirable it may be for law enforcement officers to act reasonably when engaged in activities that are neither searches nor seizures, the Fourth Amendment does not require it.  Thus, even assuming that the officers' comments during the videotaping indicate some prurient motive

---

[3] If indeed this area is "curtilage," then the officers could not have *physically* entered it without a warrant, barring exceptional circumstances.

-4-

behind the surveillance, it is immaterial to the Fourth Amendment issue.[4]  Similarly, the extent to which Clarke's neighbors consented to the surveillance is also not relevant.[5]  It is the fact that the neighbors themselves *could* have viewed Clarke's activities that removes the observation of those activities from the protection of the Fourth Amendment.  How those activities were *actually* viewed – even if it was through outright trespass – does not change their status.[6]  *See Fields*, 113 F.3d at 322 (rejecting assertion that officers' trespass violated Fourth Amendment when activities observed by officers were conducted in area where others were free to come and go).

## II.    Evidence From Physicians and Psychologist

Prior to seeking an indictment from the grand jury, the government subpoenaed testimony and medical records from three of Clarke's physicians and her psychologist.  Clarke contends all that evidence should be excluded on the basis of physician-patient privilege and psychotherapist-

---

[4] Though a prurient motive would not make the videotaping a Fourth Amendment violation, the comments made on the videotape hardly demonstrate such a motive.  The most that could be said is that, at a few points, the officers shooting the videotape made crude remarks.  Such remarks do not demonstrate anything more sinister than a lack of professionalism on the part of the investigators.

[5] Although I am willing to accept it as true for the purpose of this motion (because it is irrelevant), the claim that Clarke's neighbors did not consent to the officers' activities is incredibly speculative.  Clarke's argument is that, had the neighbors known the kind of comments the officers would make, they would not have permitted the officers' into their house.  There is no evidence supporting that contention.

[6] Conversely, the fact that officers have *not* trespassed when they conduct an observation does not mean the Fourth Amendment permits the observation. *See Katz*, 389 U.S. 347 (recording phone conversations constitutes a search even though placing of recording device was not a trespass); *Kyllo*, 533 U.S. at 30 (observation of activities in house by use of thermal imaging constitutes a search despite fact that officers using device did not trespass).

patient privilege.[7]  She is incorrect.

First, to the extent Clarke is asserting a physician-patient privilege, the federal courts do not recognize such a privilege.  *In re Doe*, 711 F.2d 1187, 1193 (2d Cir. 1983).

Second, although there is a federally recognized psychotherapist-patient privilege, *see Jaffe v. Redmond*, 518 U.S. 1 (1996), Clarke explicitly authorized disclosure to the United States Attorney for the District of Connecticut and the Law Department of the United States Postal Service, in connection with her civil lawsuit, "any and all records, information and evidence in their possession regarding my physical, psychological or psychiatric condition and treatment . . . ."  Clarke has not offered anything that would dispute the validity of that waiver.  Accordingly, even assuming some of her communications with her physicians or psychologist were protected by the psychotherapist-patient privilege, the privilege has been waived by disclosure.[8]

## III.    Government Misconduct

Clarke argues that the indictment should be dismissed as a sanction for the government's misconduct in investigating and prosecuting this case.  Specifically, she contends that dismissal

---

[7] Without elaboration, Clarke's counsel suggested at oral argument that the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") might forbid the government's use of Clarke's medical records.  I am not going to rule on the issue because Clarke has not briefed the argument or cited any authority in support of an exclusion based on HIPPA.  I do note that on its face HIPPA appears to explicitly allow the government to obtain the information it did, either as a disclosure for "health oversight activities," 45 C.F.R. § 164.512(d), or as a disclosure for "law enforcement purposes," 45 C.F.R. § 164.512(f).  If Clarke wishes to make a motion based on HIPPA, it should be filed promptly.

[8] Because of the existence of an express waiver there is no need to reach the question whether Clarke has created an "at issue" waiver by using these doctors' opinions to obtain disability benefits, *see, e.g.*, *Schoffstall v. Henderson*, 223 F.3d 818 (8th Cir. 2000), or whether such use fits into a "crime-fraud" exception to the psychotherapist-patient privilege, *see, e.g.*, *In re Grand Jury Proceedings (Gregory P. Violette)*, 183 F.3d 71 (1st Cir. 1999).
.

is warranted by the government's decision to bring this prosecution while Clarke had a civil lawsuit pending against it and by the way her case was investigated.  In other words, Clarke seeks a dismissal on two grounds: (a) prosecutorial misconduct, specifically, vindictive prosecution, and (b) investigative misconduct.

A.      Prosecutorial Misconduct

The original indictment in this case was returned some time after Clarke initiated a civil lawsuit against her government employer for discrimination.[9]  Clarke claims that the timing of the government's prosecution of criminal charges against her indicates a vindictive motive sufficient to warrant dismissal of the indictment.

Although a prosecutor is afforded broad discretion to determine when pursuit of criminal charges is appropriate, that discretion may not be used to punish a person for exercising constitutional rights.  *United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000) (citing *Bordenkircher v. Hayes*, 434 U.S. 357 (1978)).  Accordingly, if there is an unrebutted presumption of vindictiveness or if a defendant demonstrates "actual vindictiveness," dismissal of the indictment is appropriate.  *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir. 1999).

A presumption of vindictiveness, which shifts the burden of proof to the government, only arises when the circumstances of the case pose a "realistic likelihood" of vindictiveness in all similar cases.  *Sanders*, 211 F.3d at 717.  Typically that circumstance is only present when the government initiates a criminal prosecution as a result of the defendant's activities after conviction on a separate charge.  *United States v. White*, 972 F.2d 16, 19 (2d Cir. 1992).  The

_____

[9] However, the Postal Inspector began investigating Clarke before she filed her civil lawsuit.

mere existence of a parallel civil lawsuit against the government is insufficient to give rise to such a presumption.

> To establish actual vindictiveness, a defendant must show that

>> (1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a "stalking horse," and (2) [the defendant] would not have been prosecuted except for the animus.

*United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999). Clarke has not established either element. Her only evidence is (a) the timing of the indictment and (b) the fact that at some point the government attempted to resolve the criminal and civil proceedings together. That evidence is not nearly sufficient to establish either of the two elements of actual vindictiveness.[10] Consequently, dismissal on the grounds of vindictive prosecution is inappropriate.

> B.    Investigative Misconduct

Clarke argues that the government's investigation of her case involved instances of impropriety that warrant dismissal of the indictment. Specifically she contends that the following actions deserve that sanction: (a) the government's invasion of the attorney-client privilege; (b) inappropriate comments made by the officers conducting videotape surveillance; and (c) the government's questioning of two Administrate Law Judges ("ALJs") who heard Clarke's, allegedly fraudulent, claims of disability.

Under very rare circumstances, improper investigation of a criminal matter may warrant the extreme sanction of dismissal of the resultant indictment. Those rare circumstances involve

---

[10] Neither is the evidence sufficient to entitle Clarke to discovery or a hearing on her claim. *See Sanders*, 211 F.3d at 717 ("defendant must provide some evidence tending to show the existence of the essential elements" in order to be entitled to discovery on a vindictive prosecution claim).

cases where "there [is] a need either to eliminate prejudice to a defendant in a criminal

prosecution, where it [is] impossible to do so by imposition of lesser sanctions, or to deter a

pattern of demonstrated and longstanding widespread or continuous official misconduct." *United

States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979). Clarke's case presents neither

circumstance.

      1.    *Attorney-Client Privilege*

Contained in the subpoenaed medical files of one of Clarke's doctors was a document

that appears to be Clarke's typewritten comments concerning parts of the videotaped surveillance

of her property. On the bottom of one of the pages, Clarke's attorney's name is handwritten.

Clarke's attorney asserts that this document was prepared at his request. Clarke contends that the

government's failure to promptly return this document to her or her attorney is sanctionable

misconduct. I disagree.

There is nothing on the document that indicates it is privileged. The handwritten

attorney's name, at most, indicates that the document was copied to him. There is no indication

on the face of the document that it was prepared at his request or that it was seeking legal advice.

Moreover, the document was found in the files of a third-party, which would appear to indicate

that the communications were not confidential or, if they were, that any privilege was waived.

Accordingly, even if the document is in fact privileged – an issue I do not reach because it is not

presented[11] – the government's failure to recognize that fact was entirely understandable and

certainly not misconduct.

---

[11] Clarke has not moved to prevent the document's presentation at trial, and, in any event, the government has represented that it does not intend to use it.

Clarke also contends that the case should be dismissed because the government took "five (5) surveillance photographs depicting the defendant meeting with . . . an associate in the office of [her lawyer], who appears to be holding files relating to the defendant's case."  The government contends that these pictures, which were taken at Clarke's deposition, were part of its general surveillance of Clarke's physical condition, and only incidentally included her lawyer. Regardless of the government's motivation, photographing a client meeting with her attorney in a public place is not an invasion of the attorney-client privilege, let alone government misconduct.

       2.     *Comments on the Videotape*

Clarke argues that the indictment should be dismissed because of the "overtly sexualized" nature of the videotaped surveillance and the "salacious commentary" made by the officers conducting the surveillance.  These descriptions of the surveillance tape, taken from Clarke's counsel's motion papers, are hyperbolic.  The videotapes are, in fact, fairly run-of-the-mill surveillance videos, which contain occasional off-color or crude remarks by the officers making the tape.  There is nothing "sexualized" about the tapes, overtly or otherwise, and they certainly do not amount to – as was suggested at oral argument – "soft-core porn."  I acknowledge that some of the comments made on the video are not nice, but Clarke has not identified any way in which those comments will prejudice her defense, and they are not the kind of "longstanding widespread or continuous official misconduct" that justifies the drastic remedy of dismissing an indictment.

       3.     *Questioning of Administrative Law Judges*

As part of the government's investigation into Clarke's alleged fraud, the two ALJs who decided Clarke's disability claims were interviewed.  The ALJs were, among other things, shown

portions of the videotape surveillance of Clarke and asked whether their decisions would have been different had they seen the videos.

Clarke contends that this conduct "is so horrifying and so utterly at odds with any concept of an independent and unintimidated judiciary that it is simply astonishing that a lawyer from the government would even attempt to defend it."  Brief, (doc. # 63), at 3.  To remedy this misconduct, Clarke argues, the indictment must be dismissed because "[m]ere suppression of the evidence would be a meaningless, and ludicrously ineffective remedy."  *Id.*

I fail to understand why the prospect of a judge being questioned as part of a government investigation is "horrifying."  Save in cases over which they preside, judges are competent witnesses.  *See* Federal Rules of Evidence 601, 605.  In fact, one of the leading evidence treatises observes that "judges commonly testify about matters occurring in former trials at which they presided."  McCormick on Evidence § 68 n.3 (collecting cases).  Of course, merely because a judge is competent to testify does not mean that it will always be appropriate.  The judge must have relevant testimony and it must not be substantially outweighed by the danger of unfair prejudice or of misleading the jury.  *See, e.g.*, *United States v. Munoz-Franco*, 203 F. Supp. 2d 102 (D.P.R. 2002) (refusing to allow judge to testify when such testimony would be prejudicial and cumulative).

Because it is not at all out of the question for an ALJ to be called to testify at a trial over which she is not presiding, I cannot see how the government acted inappropriately in seeking what it believed to be relevant information from two ALJs.  I do not know that either ALJ will

ultimately be allowed to testify,[12] but given that each has arguably relevant information – about what occurred at the hearing and what material statements Clarke made – I am unable to conclude it was inappropriate for the government to speak to these ALJs.[13]

## IV.    Conclusion

Patricia Clarke's Motion to Suppress Fruits of Video Surveillance (doc. # 11); Motion to Dismiss (doc. # 14); Motion to Suppress Fruits of the Invasion of Physician-Patient Privilege (doc. # 17); Motion to Suppress Fruits of the Invasion of the Psychotherapist-Patient Privilege (doc. # 20); Motion to Dismiss (doc. # 49); and Motion to Dismiss on Grounds of Additional Government Misconduct (doc. # 63) are DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 19th day of July 2005.

   /s/ Stefan R. Underhill
          Stefan R. Underhill
          United States District Judge

---

[12] For example, at oral argument James Clarke's counsel raised the potentially meritorious objection that allowing the ALJs' testimony about why they made their decision, i.e., which representations of Clarke's were *subjectively* material, would not be relevant to the question of whether Clarke made any *objectively* material misrepresentations.

[13] Clarke's additional argument that, "[t]he principal motivating purpose in the government's repeated interrogation of judges who had the temerity to rule against its position was not to gather evidence against the defendant but to intimidate those judges," is entirely unsupported.  Brief (doc. # 63-2) at 3-4.  I decline to address it.